GOLDSMITH, comptroller-general, *vs.* THE SOUTHWESTERN RAILROAD COMPANY.

THE SOUTHWESTERN RAILROAD COMPANY *vs.* GOLDSMITH, comptroller-general.

[These cases were argued at the last term, and decision reserved.]

No proper return—such as is required by the act of 1874 as a condition precedent to the remedy by affidavit of illegality in Fulton superior court—having been made by the Southwestern Railroad Company—returning and itemizing the property of said corporation—the remedy by such affidavit is not given to said company, and the superior court of Fulton county had no jurisdiction of the case, and the affidavits should have been dismissed. The complications of this case render a bill in equity the more appropriate remedy independent of the question of jurisdiction.

WARNER, C. J., dissented.

Tax. Railroads. Jurisdiction. Laws. Before Judge GRICE. Fulton Superior Court. April Term, 1878.

The comptroller-general issued two tax *fi. fas.* against the Southwestern Railroad for taxes for 1876 and 1877, and penalties for non-payment, assessing them "from the best information he could procure." The defendant filed an affidavit of illegality to each *fi. fa.*, claiming exemption under its charter from any tax greater than one-half of one per cent. on its net annual income, and alleging that neither the tax nor penalty was due ; that it had made returns as required by the act of 1874, and paid the legal tax above stated ; and that the property tax now sought to be enforced was illegal and illegally assessed. The two cases were tried together. The state demurred to the affidavits on the following, among other grounds :

(1.) Because if said limited rate of taxation ever was a valid contract between the state and said company, it applied to a railroad to be built from the city of Macon to some point intermediate between Albany and Fort Gaines, or to some point on the Flint or Chattahoochee rivers below

Albany and Fort Gaines; that the termini of said road was Distinctly fixed in the charter, but in point of fact said road, meaning the main line thereof, was not built to either of said points, but to the city of Eufaula, without authority, and hence said company cannot legally claim the benefit of said limited rate of taxation, and that the roads taxed by the *fi. fa.* are not the roads subject only to limited taxation.

(2.) Because by the act of 1850, amending the act incorporating said Southwestern Railroad, authority was given by the legislature to build a branch of said road from some point on said road to some point on the Chattahoochee river below the town of Florence, that said branch road was built under said amendment. Said amendment did not confer said limited rate of taxation upon said branch, and hence the same is liable to taxation as other property in this state.

(3.) Because the said Southwestern Railroad Company, on the —— day of ————, 18—, leased all of its roads and appurtenances, and all of its property, perpetually to the Central Railroad and Banking Company, of said state of Georgia, and according to law said privilege of limited taxation, granted by the original charter of said Southwestern Railroad Company, did not pass to the Central Railroad Company and ceased, and determined by operation of said act of alienation and the stipulations of said lease that the Central Railroad should pay all taxes due, and to be due, the public by said Southwestern Railroad Company.

(4.) Because by the consolidation of the Southwestern Railroad and the Muscogee Railroad in 1868, the privilege of limited taxation secured to the Muscogee Railroad by its charter, did not pass to the Southwestern Railroad Company, except by the contract of consolidation in 1868, which was repealable, and was repealed, by the act of 1874, and the acts amendatory thereof, said contract of consolidation being a sale of the Muscogee Railroad to the Southwestern Railroad, by which the exemption could not pass, except by virtue of the repealable act of the acts of 1855.

(5.) Because by the act incorporating said Southwestern Railroad, no limited rate of taxation was prescribed for the branches authorized to be built, and hence the branch road from Cuthbert to Fort Gaines is liable to taxation separate and apart from the main line of said road, and said company has never paid the property tax required by law on said branch.

(6.) Because the Southwestern Railroad has not paid the tax required by law upon its increased capital stock, authorized by the acts of the legislature of December 10, 1860, and December 18, 1860, amounting to $445,900.00.

(7.) Because the Southwestern Railroad has no exemption upon that portion of said road from Fort Valley to Butler, (called, in the act amending the charter, Wolf's Pen.)

By agreement, the cases were submitted to the court without a jury. Various resolutions, reports, etc., relating to the extensions of the road, their cost, etc., were introduced in evidence, but are not material here.

The returns made by the comptroller-general, from which he issued said *fi. fas.*, are as follows :

" Annual tax returns of the Southwestern Railroad Company, of all property owned by said company on the 1st day of May, 1876, made to the comptroller-general by the president, by virtue of an act approved February 28, 1874, without deducting the indebtedness of said company : No. acres of land, 5,000 ; value of land, $9,990.50. No. of bridges, 31 ; value of bridges, $260,000.00. No. of depots and other buildings, 75 ; value of depots and other buildings, $197,000.00. No. of engines, 31 ; value of engines, $250,-000.00. No. of cars, 417 ; value of cars, $275,000.00. Value of bonds owned, $6,900.00. No. of shares bank, railroad or other stock owned in other ompanies, 6,413 ; value of bank, railroad or other stock owned in other companies, $431,856.46. Value of property owned in steamships, ships and other craft—all other capital, $24,719.63. No. of miles of track, 306 ; value of track, including iron, ties, etc., $4,173,942.44. Notes, $11,250.41.

Total value of all property enumerated....$5,640,659 99
Tax at —— of one per cent..................$28,203 29
Credited by net income tax at one-half of one
    per cent. paid........................      1,561 19

                                         $26,642 10

"This return is made by the comptroller-general according to law, from the best information he could procure.

       (Signed)         W. L. GOLDSMITH,
December, 1877.         *Comptroller-general.*"

The return of May 31, 1877, was merely a duplicate of the preceding.

The defendants proved by W. L. Goldsmith, comptroller-general, that the taxes of these roads were duly given in for the years 1874, 1875 and 1876, both on the gross and net income, and on the value of their property, as required by the tax act of those years, and that they paid the taxes of one-half ($\frac{1}{2}$) of one per cent. per annum, he, as comptroller-general, sending them printed forms on which to make their said annual returns; that for the year 1877, and after the decision of the supreme court of the United States was made, he only sent those roads printed forms applicable to taxes on their income, and they made, for that year, a return on such blank forms of the amount of gross receipts and net income, which was received without objection or protest, and the taxes returned were duly paid. That after these were so made and accepted, and the taxes paid, he, as comptroller-general, without notice to those railroad companies, or either, and without calling on them for any further or other return, issued these executions, based solely on the returns made by these roads of the value of their property in 1874, under the act of that year. Neither of said roads have paid any taxes on their property for the years for which these *fi. fas.* were issued, excepting that on their net income.

In 1876 the president of the Central Railroad made the

following return, in which was included the returns both for the Central and Southwestern Railroads :

Annual tax returns of the Central and Southwestern Railroads from the 1st day of September, 1875, to the 31st day of August, 1876, at one-half per cent. on net earnings ; made to the comptroller-general, by the president : Name of the company, Central and Southwestern Railroads ; state where chartered, Georgia ; gross receipts, $2 041,-429.28 ; net earnings, $312,238.10 ; tax of one-half per cent., $1,561.19. (Sworn to by president.)

The return for 1877 was similar in form, differing only in amounts.

The presiding judge rendered the following decision :

" This case having been referred to me, by consent, for determination upon the law and facts, it is, after argument, considered and adjudged that the partial immunity from taxation granted in the charter to the Southwestern Railroad Company, as well as that to the Muscogee Railroad Company, in its charter, continues unaffected by merger or lease. I further hold that the extent of this immunity has not been decided by the supreme court, but is still an open question.

" In my judgment, the Southwestern Railroad Company, with its appurtenances, is exempt from taxation, except as specified in the charter, upon the road and its branches built under the original charter, to-wit: the road from Macon to Americus, from Smithville to Cuthbert, and from Cuthbert to Fort Gaines. The branches built under amendments to the charter containing no express exemption, are subject to the tax of 1874, and such of them as have not paid the tax are liable for it under these executions. The company is also liable for that part of the Western Road of Alabama which is located in this state.

" Being unable to determine, from the proof, what taxes are still due on other property of the company, I make no further attempt at specification, and decide nothing as to its liability for taxes on other property, whether mentioned

in the demurrer or not. The tax on the road from Americus to Albany has been paid, and the illegality is sustained as to that part of it.

"I therefore overrule the demurrer as a whole, and sustain the affidavit of illegality as to all of said tax except that above specified, upon the sole ground that I cannot ascertain from the evidence what taxes are still due and what are not. It is further ordered that this is not to be held as an adjudication of the right of the state to proceed hereafter for taxes on such other property for the years 1876 and 1877.

"Let the execution proceed for.$2,000.00 for each of the years 1876 and 1877, being the unpaid tax for each of said years on the branches of the road indicated above, and on that part of the Western Road of Alabama which is situated in Georgia; and let the illegality be sustained for the remaining part of said executions."

Both parties excepted.

R. N. ELY, attorney-general; R. TOOMBS; D. M. DuBOSE, for the comptroller-general.

A. R. LAWTON; LYON & GRESHAM, for the railroad.

JACKSON, Justice.

The record in this case as in that of the *The State vs. The Augusta and Savannah Railroad Company*, and *The State vs. The Georgia Railroad and Banking Company*, and *The State vs. The Central Railroad and Banking Company*, shows no such returns made by this company for the years 1876 and 1877 as entitles the company to the remedy by affidavit of illegality in Fulton superior court. Those returns are required by the act of 1874, and modifications thereof in subsequent acts, as conditions precedent in order to entitle the company to this remedy. The affidavit of illegality should, therefore, have been dismissed for want of jurisdiction in the court to try it. The facts of the case are

so complicated that more adequate relief can be afforded in equity, and that would seem to be the better forum independently of the question of jurisdiction.

Judgment reversed.

BLECKLEY, Justice, concurred.

WARNER, Chief Justice, dissenting.

This case came before the court below on affidavits of illegality to two tax *fi. fas.*, which had been issued by the comptroller-general of the state against the Southwestern Railroad Company—one for the sum of $26,642.00 as its tax for the year 1876, and for the further sum of $79,926.00 as penalty, which *fi. fa.* was issued and dated 3d day of September, 1876 ; the other *fi. fa.* was issued and dated on the same day, for the sum of $28,203.00 for its tax for the year 1877, and for the further sum of $84,609.00 as penalty, both of which were levied on the property of the defendant. By consent, the two cases were tried together, and submitted to the court for trial without the intervention of a jury. It was also agreed that the evidence contained in the record should be read and considered by the court in connection with the defendant's affidavits of illegality, to which the counsel for the state demurred, which demurrer the court overruled as a whole, as stated in the record; whereupon the counsel for the state excepted. The court also decided that the defendant was liable to pay the tax assessed on its branch roads from Cuthbert to Eufaula, and from Albany to Arlington, and for that part of its Western Railroad of Alabama, located in this state, the sum of $2,000.00 for each of the years 1876 and 1877. Whereupon the defendant excepted. It appears from the evidence in the record, that the defendant returned its property for taxation as required by the act of 1874, for the years 1874, 1875 and 1876, and that the assessment of the taxes on which the tax *fi. fas.* were based, was made by the comptroller-general for the years 1876 and 1877, in the month of December, 1877.

The defendant proved by W. L. Goldsmith, comptroller-general, that the taxes were duly given in for the years 1874, 1875 and 1876, both at the gross and net, and on the value of its property, as required by the tax act of those years, and that it paid the taxes of one-half ($\frac{1}{2}$) of one per cent. per annum, he, as comptroller-general, sending them printed forms on which to make their said annual returns; that, for for the year 1877, and after the decision of the supreme court of the United States was made, he only sent those roads printed forms applicable to taxes on their income, and they made, for that year, a return on such blank forms, of the amount of gross receipts and net income, which was received without objection or protest, and the taxes returned were duly paid; that after these were so made and accepted, and the taxes paid, he, as comptroller-general, without notice to those railroad companies, or either, and without calling on them for any further or other return, issued these executions, based solely on the returns made by these roads of the value of their property in 1874, under the act of that year. Neither of said roads have paid any taxes on their property for the years for which these *fi. fas.* were issued, excepting that on their net income.

The defendant in its affidavit of illegality to the tax *fi. fas.* for the tax assessed against it for the years 1876 and 1877, alleges several grounds of illegality thereto, one of which is, that said tax was "illegally assessed," that is to say, without authority of law, and the issue thus made by the demurrer upon the facts contained in the record, was whether the assessment of the tax for either of those years, was made in accordance with the laws of the land, or in violation thereof, the defendant insisting that on the statement of facts contained in the record (which it was agreed the court might consider) that the tax was illegally assessed by the comptroller-general, and the state, by its demurrer, joined issue, and insisted that, admitting all the facts contained in the record to be true, that the assessment of the tax by the comptroller-general was a legal and valid assess-

ment, and demanded the judgment of the court upon that issue thus made by the demurrer, and the question is, whether under the law, the assessment of the tax for either of the years 1876 or 1877, was a legal and valid assessment ? It is insisted that the assessment for the year 1876 is legal and valid, though made in December, 1877, because it was based on the defendant's return made in 1876, before the passage of the act of the 22d of February, 1877, and therefore that act has nothing to do with the assessment based on the defendant's return for the year 1876. That act declares that from and after its passage, "whenever corporarations, companies, persons, agencies, or institutions, are required by law to make return of property, or gross receipts, or business, or income, gross, annual, net, or any other kind, or any other return to the comptroller-general for taxation, such return shall contain an itemized statement of property, each class or species to be separately named and valued, or an itemized account of gross receipts, or business, or income, as above defined, or other matters required to be returned, and in case of net income only, an itemized account of gross receipts and expenditures to show how the income returned is ascertained ; and such returns shall be carefully scrutinized by the comptroller-general, and if in his judgment the property embraced therein is returned below its value, he shall assess the value within sixty days thereafter, from any information he can obtain, and if he shall find a return of gross receipts, or business, or income, as above defined, or other matters required to be returned as aforesaid, below the true amount, or false in any particular, or in any wise contrary to law, he shall correct the same and assess the true amount from the best information at his command within sixty days." If the statute had stopped there, it might be said with some degree of plausibility that it contemplated only such assessments as should be made on returns made after its passage, but the statute does not stop there ; it further declares : " And in *all cases of assessment,* or correction of returns as herein provided, the officer or

person making such returns shall receive notice, and shall have the privilege within twenty days after such notice, to refer the question of true value, or amount, as the case may be, to arbitrators, one chosen by himself and one chosen by the comptroller-general, with power to choose an umpire in case of disagreement, and their award shall be final." It was the assessment of the taxes made by the comptroller-general in December, 1877, after the passage of the act of 22d February, 1877, that was the foundation of the tax *fi. fas.* issued against the defendant; that was the judgment, so to speak, upon which the *fi. fas.* were based; the return of the defendant of its taxable property for the year 1876 might have remained in the comptroller-general's office for an indefinite period of time without any pecuniary detriment to it, but for the assessment made on that return by him in December, 1877.

But it may be said, that although the assessment of the tax was not made until December, 1877, it was made under the old law, and the act of the 22d of February 1877, did not apply to it. The reply is, that up to December, 1877, the returns of the defendant and the payment of its taxes thereon, had been received and accepted by the comptroller-general, without objection or protest, or any alleged default on its part, and the words of that act are broad enough to include that assessment, and that *all* assessments made by the comptroller-general on the returns of corporations, or the correction thereof made by him after its passage, were to be made in pursuance of that act, whether the returns had been made before or after its passage. The assessment of the additional tax claimed by the comptroller-general in December, 1877 is, in view of the facts of this case, not only within the letter of the act of 1877, but within the reason and spirit of it. The general assembly intended to establish a new rule for the assessment of taxes made after the passage of that act on the returns of corporations from that which existed under the old law, and may well have supposed that there might be returns of corporations upon which the

comptroller-general had made no correction or assessment, as in the case now before us, and therefore declared that in "all cases of assessment, or of correction of returns as herein provided, the officer or person making such returns shall receive notice, etc." The evil which existed under the old law was that when incorporated companies made their returns to the comptroller-general he had no authority to correct the same, and assess the true value of the property, etc., as is now provided by the act of 1877, and that act was intended to remedy that evil and also to repeal that *odious* feature in the old law which allowed an assessment to be made by the comptroller-general for the additional tax claimed, and execution to issue therefor without any *notice* whatever to the company. The evidence in the record in this case discloses the fact that the defendant returned its property for taxation for the year 1876, and paid thereon one-half of one per cent. on the annual income thereof; that for the year 1877, after the decision of the supreme court of the United States in its favor, it returned the amount of its gross receipts and net income, and paid thereon one-half of one per cent., which returns and payments were both received by the comptroller-general without objection or protest, or any alleged default on its part; and that after these returns were so made and *accepted* by him, and the taxes aforesaid *paid*, the comptroller-general, without *notice* to the defendant, and without calling upon it for any further or other return or payment, on the 3d day of December, 1877, proceeded to assess against it the respective amounts for which the tax executions were issued as set forth in the record, and this assessment of tax, including the penalty of $164,535,00, so made in December, 1877, against the defendant, when its returns for the years 1876 and 1877 had been received, and the taxes paid as aforesaid, without protest or objection, or notice of any default, is claimed to be a legal and valid assessment under the old law so far as the assessment of the tax for the year 1876 is concerned, notwithstanding the old law was repealed by the act

of 1877 as to assesments of tax made after its passage in this class of cases, if any such old law ever existed applicable to the state of facts disclosed in this record. The difficulty in the way of proceeding under the old law is, that the defendant's returns and payments of taxes had been received· and accepted by the proper officer of the state without objection or notice of any default, and before that officer could issue an execution against the defendant for the additional taxes claimed and penalty, an assessment therefor had to be made, and as that assessment was not made on the defendant's returns for 1876, nor for 1877, until after the passage of the act of 1877, therefore the assessment necessarily had to be made according to the provisions of that act, if indeed the old law had provided for such an assessment on the statement of facts contained in the record.

A pertinent inquiry presents itself here, what old law is it, and where is it to be found, that authorized the comptroller-general of the state, after he had received the defendant's returns for the years 1876 and 1877, without objection or protest, and had received its tax thereon for those years of one-half of one per cent. on its annual income, without any alleged default on its part, to assess an additional tax on its property in December, 1877, without any notice, for the purpose of taxing its property as the other property of the people of the state was taxed under the act of 1874? Are the people of the state taxed one-half of one per cent. on the annual income of their property returned? and after the payment thereof to the state officer, without objection or protest, then liable to have their property assessed at its value for taxation in addition thereto without notice? If the defendant had failed to make any return, or its returns had been objected to by the comptroller-general for the years in which the same were made, and at *the time* of making the same, then it would have presented a different question, but there was no alleged default, and no attempt to correct the defendant's returns,

and assess the additional tax and penalty claimed, until December, 1877, after the passage of the act of that year. Was the assessment of the tax and penalty by the comptroller-general in this case, in December, 1877, and issuing the executions therefor, after it had made its returns without objection or protest, and paid one-half of one per cent. on its annual income to the state, and, without any notice, taxing the defendant on its property as the other property of the people of the state was taxed, according to the provisions of the act of 1874? It should be remembered that the comptroller-general never assessed any tax on the defendant's returns, as required by the act of 1874, until December, 1877.

The tax of one-half of one per cent. on the annual income of the defendant's property for the years 1876 and 1877, which was received by the comptroller-general for those two years, could not have been received by him as a condition precedent to the rights of the defendant to contest the payment of the assessment of the tax made by him in December, 1877, as contemplated by the tax act of 1875, for the simple reason that the defendant had nothing to contest in relation to its returns, or the payment of its taxes for those two years up to that time, the same having been received by the comptroller-general without objection or protest. There was no ground for any contest, nothing to contest about, no alleged default until the assessment of the additional tax claimed in December, 1877, was made, and the penalty of $164,535.00 for its then alleged default was demanded, for which the executions issued. It is extremely difficult to perceive why that assessment of the additional tax claimed should not be considered as having been made under the act of 22d February, 1877, and be controlled by it, inasmuch as no tax had been assessed on the returns of the defendant by the comptroller-general as required by the act of 1874, until after the passage of the act of 1877.

The 876th section of the Code provides that when corporations shall fail to return the taxable property, or pay an-

33

nually the taxes for which they are liable, the comptroller-general shall issue an execution against them for the amount of taxes due *according to law.* The comptroller-general, it will be seen, is only authorized by this section to issue executions against *defaulting* corporations for the amount of taxes for which they are liable *according to law.* The act of 1874 taxes the property of railroad companies as other property of the people of the state is taxed, and upon failure to return their property, and pay the tax assessed thereon by the comptroller-general, as other property of the people of the state is taxed, the comptroller-general is authorized to enforce the collection of the same in the manner provided by law for the enforcement of taxes against other incorporated companies. See the 876th section of the Code above cited. Thus it will be seen that the comptroller-general was only authorized to assess such a tax against the defendant on its returns for 1876 and 1877, as it was liable for *according to law*—that is to say, such a tax on its property as other property of the people of the state is taxed. The question recurs, are the people of this state taxed one-half of one per cent. on the annual income of their property, and, after payment thereof, then liable to have that same property assessed at its value for taxation in addition thereto without notice? That is the sort of a tax which has been assessed against the defendant by the comptroller-general in this case, in December, 1877, with the penalty added thereto.

If such an assessment as that, including the penalty of $164,535.00, could have been legally made by the comptroller-general under any old law, in view of the facts of this case, then upon principle, without the aid of the act of 1877, the defendant should have had *notice* of the assessment of the additional tax demanded that it might have avoided the penalty for its then first alleged default, and such is the requirement of that act. Inasmuch, therefore, as the defendant's returns of its taxable property for the years 1876 and 1877, were made to the comptroller-

general in the manner as required by him for those years and such returns, so made, having been received without any protest, or objection, and the tax of one-half of one per cent. on its net annual income having been paid by it for each of those years to the comptroller-general, and the same having been *accepted* by him as its tax due to the state for those two years, without any protest, or objection, or alleged default, and as there was no notice given to the defendant of any default on its part, either in making its returns or in the payment of its taxes for those two years up to the time the assessment was made in December, 1877, that assessment of the additional tax in both cases, including the penalty of $164,435.00, for its then first alleged default, without any notice to the defendant as required by the act of 22d of February, 1877, (the assessment in both cases having been made after the passage of that act) was illegal, and the two executions based thereon were illegal, for the reasons hereinbefore stated, and there was no error in overruling the demurrer as a whole on the statement of facts contained in the record. I am therefore of the opinion that the judgment of the court below overruling the demurrer should be affirmed, and that so much of the judgment of the court as decided that the defendant was liable to pay the tax, so illegally assessed, of $2,000.00 for each year on its branch roads from Cuthbert to Eufaula, and from Albany to Arlington, and for that part of the Western Railroad of Alabama located in this state, should be reversed.